**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**     **No. 07-20327**

**vs.**          **HONORABLE JULIAN ABELE COOK JR.**

**ROY BAILEY (D-1),**

    **Defendant.**

_____/

### DEFENDANT ROY BAILEY'S MEMORANDUM IN AID OF SENTENCING

  Roy Bailey, through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing.  On March 9, 2009, Mr. Bailey will come before this Court to be sentenced for the crimes of Conspiracy to Defraud the United States, 18 U.S.C. § 371, Misprision of Felony, 18 U.S.C. § 4, and Conspiracy to Commit Bribery. 18 U.S.C. §§ 201, 371.  For the reasons stated below, counsel requests that the Court impose a sentence of fourteen months of incarceration.

**I.**  **INTRODUCTION**

  Roy Bailey has served in the military and the federal government for nearly three decades.  Beginning in the late 1990s, after more than twenty years of honorable service to the United States, Mr. Bailey began to occasionally perform favors for friends in his capacity as Assistant District Director of Detention and Deportation (ADD) with the Immigration and Naturalization Service (INS) and the Department of Homeland Security/Immigration and Customs Enforcement (ICE).  On September 16, 2008, Mr. Bailey accepted full responsibility for his conduct and entered pleas of guilty to the charges of Conspiracy to Defraud the United States, Misprision of Felony, and Conspiracy to Commit Bribery pursuant to an agreement with the United States.

For a number of reasons, including Mr. Bailey's nearly three decades of honorable government and military service and the absence of any criminal history, counsel requests that the Court impose a sentence of fourteen months of incarceration. The requested sentence is reasonable and is supported by the factors enumerated in 18 U.S.C. § 3553(a). This memorandum discusses Mr. Bailey's unlawful conduct and provides the Court with information about Mr. Bailey's history and character. Mr. Bailey accepts full responsibility for what he has done and recognizes that he must be punished for his crimes. Through this memorandum, counsel seeks not to justify or excuse Mr. Bailey's criminal conduct, but to provide context for his actions and a more complete picture of Mr. Bailey's personal characteristics. Counsel's goal is to assist the Court in imposing a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553. 18 U.S.C. § 3553(a). *See United States v. Kimbrough*, 128 S. Ct. 558, 570 (2007) ([18 U.S.C. § 3553(a)], as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing.")

## II.   THE LAW GOVERNING THE SENTENCING DETERMINATION

In *Gall v. United States,* -- U.S. --, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007), the Supreme Court outlined the steps a District Court should undertake when imposing sentence:

> As we explained in [*Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456 (2007)], a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.

*Gall,* 128 S. Ct. at 596 (internal citation and footnote omitted).  Continuing, the Supreme Court explained,

> In so doing, [the district court judge] ***may not presume that the Guidelines range is reasonable.***  He must make an individualized assessment based on the facts presented.  If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.   We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.  After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*Id.* at 596-597 (internal citations omitted; emphasis added).

After describing the District Court's sentencing duties, the Court in *Gall* discussed the limited and deferential role of the appellate courts in reviewing challenges to sentences: "Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard."  *Gall*, 128 S. Ct. at 597.  The Court then articulated the two-step review that appellate courts should follow under this deferential abuse-of-discretion standard.

> [The appellate court] must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range.

*Id.*  Second, "[a]ssuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard."  *Id.*  The Court further explained:

> When conducting this review, the [appellate] court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. . . .  [I]f the sentence is outside the Guidelines range, **the court may not apply a presumption of unreasonableness.**  It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.  **The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.**

*Id.* (emphasis added).

In *Gall*, the Supreme Court also discussed the "practical considerations" that underlie the deference that is due to a District Court's sentencing decision.  First, the sentencing judge "is in a superior position to find facts and judge their import under § 3553(a) in the individual case.  The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record."  *Gall*, 128 S. Ct. at 597 (internal quotation marks and citation omitted).  "'The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court.'"  *Id.* at 597-598 (quoting *Rita,* 127 S. Ct. at 2469).

Second, "'[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do.'"  *Gall*, 128 S. Ct. at 598 (quoting *Koon v. United States,* 518 U.S. 81, 98 (1996)) (footnote omitted).  To support this point, the Court noted that, on average, district judges sentence 117 defendants every year, whereas appellate courts see many fewer cases

4

because "[o]nly a relatively small fraction of these defendants appeal their sentence on reasonableness grounds." *Id.* at 598 n.7 (citations omitted).

Applying these steps to the facts before it in *Gall*, the Supreme Court upheld the probation-only sentence that the District Court imposed, even though the advisory Guidelines called for a sentence ranging from thirty-to-thirty-seven months of imprisonment based upon Gall's guilty plea, in which Gall stipulated that he was responsible for the distribution of at least 2,500 grams of the drug ecstacy. *Gall*, 128 S. Ct. at 592-593.  The Court reversed the Eighth Circuit and upheld the reasonableness of the district court's probation-only sentence in *Gall,* even though it involved a serious crime.  The Supreme Court concluded "that the District Judge committed no significant procedural error.  He correctly calculated the applicable Guidelines range, allowed both parties to present arguments as to what they believed the appropriate sentence should be, considered all of the § 3553(a) factors, and thoroughly documented his reasoning." *Id.* at 598.

In the sentencing decision that the Supreme Court upheld in *Gall*, the District Court stated that it had considered all the factors under 18 U.S.C. § 3553(a); Gall's withdrawal from the conspiracy almost four years before he was indicted; Gall's post-offense conduct, especially his obtaining a college degree and starting his own successful business; the letters of support from his family, friends and those with whom he did business; his lack of criminal history; and his age at the time of the offense. *Gall*, 128 S. Ct. at 593.  The judge also reminded Gall that probation was not an act of leniency but, instead, was a substantial restriction of his freedom that included the potential for harsh consequences should Gall violate any of the conditions of his probation. *Id.*

In upholding the district court's sentence in *Gall*, the Supreme Court also noted that, in *Koon,* it had explicitly rejected the government's argument that *de novo* appellate review was necessary to protect against unwarranted disparities arising from the differing sentencing approaches of individual district judges. *Gall*, 128 S. Ct. at 598 n.8 (internal quotation marks and citation omitted). "Even then [in 1996] we were satisfied that a more deferential abuse-of-discretion standard could successfully balance the need to 'reduce unjustified disparities' across the Nation and 'consider every convicted person as an individual.'" *Id*. (quoting *Koon,* 518 U.S. at 113).

The Courts of the Sixth Circuit have faithfully applied *Booker*, *Gall*, and *Kimbrough* and, in several cases, have acknowledged the appropriateness of significant downward departures.  In *United States v. Weisberg*, 297 Fed. Appx. 513 (6th Cir. 2008), the Sixth Circuit reviewed a district judge's downward variance in a tax evasion case.  The district judge correctly calculated the Guidelines level of eighteen, which carries exposure of eighteen-to-twenty-four months of incarceration.  *Id*. at 515.  The district judge then noted the absence of a prior criminal record, the defendant's thirty years of service to the legal profession and the defendant's struggles with gambling addiction, heart disease, high blood pressure, and diabetes.  *See id*.  The judge then expressed his view that the Guidelines range was greater than necessary to achieve the sentencing purposes of 18 U.S.C. 3553(a)(2).  *See id*.   The judge sentenced Weisberg to five months of incarceration and five months of home confinement.  The Government appealed this "72% reduction" from the Guidelines range.  *Id*. at 517.  The Court of Appeals affirmed Weisberg's sentence, noting that "the district court considered the relevant sentencing factors and had a well articulated rationale for its variance."  *Id*.; *see also United States v. Grossman*, 513 F.3d 592 (6th Cir. 2008) (upholding district court's sentence of 66 months in prison in child

pornography case where Guidelines called for up to 120 months); *United States v. Evan Stern*, Case no. 5:07 – CR-00524 Memorandum & Order (N.D. Oh. December 19, 2008) (sentencing defendant to twelve months and one day of incarceration where Guidelines range was forty-six-to-fifty-seven months).

## III.    THE ADVISORY GUIDELINES CALCULATION

### a.    The Plea Agreement Correctly States the Advisory Guideline Offense Level

Mr. Bailey and the Government agree that the Rule 11 Plea Agreement specifies the correct offense level of nineteen, which results in an advisory Guidelines range of thirty-to-thirty-seven months of incarceration (*i.e.*, the same advisory Guidelines range that applied in *Gall*, where the Supreme Court upheld a probationary sentence).[1]  The Presentence Investigation Report (PSR) incorrectly concludes that the applicable offense level is 20, resulting in an advisory Guidelines range of thirty-three-to-forty-one months of incarceration.  *See* PSR at 15. The PSR arrives at an offense level of twenty by erroneously including as a "loss amount" attributable to Mr. Bailey the costs that the Government has projected it will incur as it returns the property that Patrick Wynne stole from INS/ICE detainees.  *See* PSR at ¶¶39, 89.  It is true that Mr. Bailey learned of Mr. Wynne's misappropriation of detainee property at some point during his service as ADD, but Mr. Bailey did not take any property from the detainees himself and did not profit in any way from Mr. Wynne's thefts.  For at least three reasons, the cost of returning property to Mr. Wynne's victims should not be incorporated in Mr. Bailey's Guidelines calculation:  1) the cost on which the PSR relies has not been proven by a preponderance of the

---

[1] The parties' sole Guidelines dispute pertains to the number of victims and loss amount calculations for the Misprision count and is addressed below.  *See infra* §III(b).

evidence; 2) it is not the type of expense that is properly considered a "loss amount" for Guidelines purposes; and 3) it exists as a result of Mr. Wynne's conduct, not Mr. Bailey's.[2]

The amount of money that the PSR claims the Government will spend to return the property stolen by Mr. Wynne -- $157,000 -- has not been proven to the Court in any reliable way. The PSR draws this figure from an estimate that the Government provided in 2005, in anticipation of Mr. Wynne's sentencing. Nearly four years later, the PSR relies on that same estimate with no discussion of what has happened during the last four years, and without providing corroborative information of any kind. Loss amounts must be established by a preponderance of the evidence. U.S.S.G. § 6A1.3 comment. This so-called loss amount (which should not be attributed to Mr. Bailey in any event) has been proffered based solely on an outdated estimate. Such a paltry showing does not constitute proof by a preponderance of the evidence.

Moreover, the Government's estimated costs are not "loss amounts" for Sentencing Guidelines purposes because they do not constitute "actual loss" or "intended loss" that flows from Mr. Bailey's conduct. U.S.S.G. § 2B1.1 application notes 3(A)(i), 3(A)(ii). The Government's costs cannot be "intended losses" flowing from Mr. Bailey's conduct, because Mr. Bailey -- who merely failed to report Mr. Wynne's thefts -- never specifically intended to cause any loss to anyone, and certainly not to the Government. Similarly, the Government's estimated costs are not "actual losses" associated with Mr. Bailey's offenses for two reasons. First, these costs resulted from Mr. Wynne's thefts, not from Mr. Bailey's failure to report the thefts. Second, the costs are exactly the type of government expenses that the Guidelines expressly exclude from § 2B1.1 loss amount calculations. The Guidelines specifically exclude, "[c]osts to

---

[2] Inexplicably, the PSR factors this loss amount into the calculation of Mr. Bailey's exposure on the Bribery and Conspiracy counts. These counts have absolutely nothing to do with Patrick Wynne's thefts. *See* PSR at ¶39.

the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense."   U.S.S.G. § 2B1.1 application note 3(D)(ii); *United States. v. Schuster*, 467 F.3d 614, 618-620 (7th Cir. 2006).   This explicit prohibition on including Government costs as loss amounts applies to the Government's costs to return detainee property in this case.[3]  For all of those reasons, Mr. Bailey is not responsible for the projected Government expense of reimbursing Mr. Wynne's victims, and his Guidelines calculation should not include that cost.

### b.   Mr. Bailey is Not Responsible, for Guidelines Purposes, for All of Mr. Wynne's Theft Victims and the Losses They Incurred

The Plea Agreement notes a dispute between Mr. Bailey and the Government over the proper Guidelines calculation for the offense of Misprision of a Felony.  It states,

> [t]he parties agree on all sentencing factors except the following:  the applicable advisory guideline range for Count Five of the Superseding Indictment under USSG §§ 2X1.1 and 2B1.1, including the total loss amount and the total number of victims for which defendant ROY M. BAILEY can be held accountable.

Rule 11 Plea Agreement at 12.  The Government, in calculating the Guidelines range, holds Mr. Bailey responsible for all of Mr. Wynne's victims and the entire monetary loss amount caused by Mr. Wynne's thefts.  It is uncontested that Mr. Bailey did not know about Mr. Wynne's thefts until long after they began.  It is also true that Mr. Bailey tried to correct some of the problems concerning the property at the Monroe Detention Center where Mr. Wynne perpetrated his crimes. [4]   In the defense's view, Mr. Bailey should not be held accountable for Mr. Wynne's

---

[3] If anything, this loss is a "consequential damage."  *United States v. Simpson*, 538 F.3d 459, 464 (6th Cir. 2008). Such losses are excluded from 2B1.1 calculations.  *Id.*

[4] Mr. Bailey directly confronted Mr. Wynne about missing detainee property in an effort to have Mr. Wynne fix the problem.  One deportation officer, Ricardo Wong, told investigating agents, "[p]roperty complaints came in on a regular basis and you can hear Mr. Bailey and Mr. Wynne going at it about property that was not returned or shipped to detainees or to their family."  Additionally, Ms. Patricia Washington-Green reported to the Government that she had heard Mr. Bailey "reprimand" Mr. Wynne regarding missing property.

victims or the amount of loss they generated because those victims are not Mr. Bailey's victims, they are Mr. Wynne's alone.

Mr. Wynne's thefts of detainee property occurred between 2000 and 2004. *See* PSR at ¶18; *see also Memorandum of the United State of America as to (1) Amount of Loss and (2) Total Number of Victims of Defendant's Criminal Activities* at 1. To show Mr. Bailey's knowledge, the Government relies on 1) the fact that "in or about 2002" Mr. Bailey reprimanded a Detention Officer who complained about a detainee not receiving his property from Mr. Wynne; 2) the fact that "[i]n September 2003," two other officers notified Mr. Bailey of Mr. Wynne's alleged theft of detainee property; and 3) an April 2003 complaint by the relative of a deportee who had not received her prisoner property from Mr. Wynne. *See* PSR at ¶¶19, 20, 21. By all accounts, each of these exchanges occurred at least two years after Mr. Wynne began stealing detainee property. Despite this, the Government asks the Court to hold Mr. Bailey accountable for all of Mr. Wynne's victims and the total amount of cash and property that Mr. Wynne took from detainees regardless of when Mr. Bailey learned about the thefts and irrespective of the fact that he did not participate in them. Such a result would offend fundamental fairness and common sense.

## IV. THE SENTENCING FACTORS IN 18 U.S.C. § 3553(a) FULLY SUPPORT A SENTENCE OF FOURTEEN MONTHS OF INCARCERATION

As explained in Section II above, the Sentencing Guidelines are no longer mandatory, and the Supreme Court has made clear that it is the duty of the District Court to impose sentence after considering not only the advisory Guidelines range, but also all of the factors enumerated in 18 U.S.C. § 3553(a). *See Gall*, 128 S. Ct. at 596 (the Guidelines are the "starting point" but district court "should then consider all of the § 3553(a) factors" before imposing sentence). 18

U.S.C. § 3553(a) sets forth the following factors, in addition to the applicable advisory Guidelines range, to be considered by the District Court:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)   the need for the sentence imposed –
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3)   the kinds of sentences available;
>
> > \*    \*    \*    \*    \*
>
> (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7)   the need to provide restitution to any victims of the offense.

The Court must consider these factors and arrive at "a sentence sufficient, but not greater than necessary," to achieve Congress's sentencing purposes.  18 U.S.C. § 3553(a).  In this case, application of those factors supports Mr. Bailey's request for a sentence of fourteen months.

**a.      Mr. Bailey's Personal History and Characteristics**

Roy Bailey was born and raised in Michigan.  He is 55 years old and has no prior criminal record.  He has been married to his wife Carol for 29 years.  The couple has two children and has lived in their Romulus home for more than 20 years.  Professionally, Mr. Bailey has spent decades serving the United States in various capacities.  In 1971, he enlisted in the United States Air Force.  In 1975, Mr. Bailey completed his military service and was honorably discharged with the rank of Sergeant.  Following his military service, Mr. Bailey joined the

United States Department of Transportation where he worked as an air traffic controller for the Federal Aviation Administration.  He remained there until 1981.  Mr. Bailey then attended the University of Toledo and obtained a B.S. in Public Administration in 1986.  After graduating from college, Mr. Bailey became a criminal investigator for the Immigration and Naturalization Service (INS).  He remained in that position until 1999.  In 1999, after interviewing for the position of Supervisory Deportation Officer (SDO) with INS, Mr. Bailey was appointed to the higher position of Assistant District Director of Detention and Removal (ADD).  In March of 2003, following INS's reorganization pursuant to the Homeland Security Act of 2002, Mr. Bailey was appointed Acting Field Office Director for the Department of Homeland Security/Immigration and Customs Enforcement (ICE).  Throughout his tenure as ADD with INS and Acting Field Office Director with ICE -- which were essentially the same position -- Mr. Bailey consistently received excellent performance ratings from his supervisors.[5]  He held that post until 2004, when he was suspended due to the investigation that led to the instant charges.

In addition to his laudable professional achievements in public service, Mr. Bailey is a devoted family man and many regard him as a caring neighbor and loyal friend.  Many of those close to Mr. Bailey and familiar with his character have written letters to the Court expressing their support for Mr. Bailey and attesting to his many character strengths. Mr. Bailey's wife of twenty-nine years writes,

> Roy is a strong, caring, compassionate and loving person … Roy has never shied away from making a decision or taking a stand because it was uncomfortable or difficult. Roy … [has] shared the duty of caregiver, traveling to Ohio and helping my father with his physical therapy and insuring his needs were being met, which kept me from being overwhelmed.  When my father passed in February of 2008, it

---

[5] One of Mr. Bailey's supervisors has previously testified that Mr. Bailey consistently "got excellents to outstandings" because of the manner in which he performed the job's "critical elements" and handled the "service priorities" of his position.

was Roy that effectively kept our family focused on what needed to be done and in perspective.

Exhibit 1 (Carol Bailey letter).  Mr. Bailey's son Craig says,

> My father is one of the most hard working and honest people I know.  Growing up I was always taught that if you say you're going to do something then it's important to do your best to keep your word.  These and other values are what helped lead me into adulthood and the person I am now… Anytime a friend or family member has a situation my dad is the first one to help out. Whether it be offering advice, giving help or knowing the right people to go to, there hasn't been a situation where my dad wasn't willing to offer whatever help he could.

Exhibit 1 (Craig Bailey letter).  By all accounts, Mr. Bailey is an exceptional husband and father

who has consistently provided love and support to his family in their times of need.

Mr. Bailey also devotes himself to his friends and neighbors and performs volunteer work

in Michigan.  Ms. Andrea Kyriacou, a close friend of the Bailey family, writes,

> Both Carol and Roy have been important in helping German Shepherd Dog Rescue of Michigan.  This organization takes homeless German Shepherd dogs and places them in permanent homes.  It is through both Roy and Carol, dogs that would have been euthanized now have safe homes.  He is a good friend, good husband, good father, and a good person.

Exhibit 1 (Andrea Kyriacou letter).  According to Mr. and Mrs. Reginald Dawson, longtime

friends of the Bailey family,

> One example of [Mr. Bailey's] generosity and community-mindedness is his support for the Wayne County 4-H club.  He makes a point of attending the annual Wayne County fair so that he can support the 4-H Club's efforts when their livestock is put up for auction… Roy Bailey has also shown support to local charities.  One charity in particular is Operation Good Cheer, which is an annual event that brings Christmas to Michigan children who otherwise would go without.  He has been a regular participant with and contributor to a local group that actively supports OP Good Cheer.

*See* Exhibit 1 (Mr. and Mrs. Reginald Dawson letter).

Mr. Bailey's distinguished career and the letters of support submitted to the Court by his

family and friends demonstrate that Mr. Bailey is, at his core, a good person who engaged in

13

conduct that was not in keeping with the character and integrity he has demonstrated in other aspects of his life.  Mr. Bailey has served his country, supported his family, performed community service, and shown kindness and loyalty to many people.  Mr. Bailey understands that he must be punished for his crimes, but a complete evaluation of Mr. Bailey's "personal history and characteristics" pursuant to 18 U.S.C. § 3553(a)(1) reveals many commendable attributes that must be considered by this Court and weigh in his favor as the Court determines a punishment "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

   **b.      The Nature and Circumstances of the Offense**

Mr. Bailey agrees with the factual recitations contained in the Plea Agreement and the PSR.  He fully admits his participation in the crimes that have brought him before the Court. However, certain facts that are not reflected in the Plea Agreement or the PSR add valuable context to Mr. Bailey's crimes and should assist the Court in determining the degree of punishment that is fair and reasonable in the circumstances of this case.

Mr. Bailey is before the Court because, after more than two decades of honorable government service and a law-abiding life, he became seduced by the attention, favors, and gratuities that people offered him as a result of his position with INS/ICE.  In 1999, after nearly 12 years at INS, Mr. Bailey applied for the position of INS Supervisory Deportation Officer. After interviewing with eight people, Mr. Bailey was chosen for that position.  On the day that he reported to begin work as an SDO, he was told that he was being appointed to the even higher position of Assistant District Director of Detention and Removal (ADD) because the previous ADD had been terminated for poor performance.  As ADD, Mr. Bailey would manage Detention and Removal Operations (DRO), a department of twenty employees with an $8,000,000 budget. They had six cars, fifteen vans, and housed detainees at about twenty different jails.  When Mr.

Bailey became the ADD, DRO was in total disarray.  Employees were not held accountable, the department's vehicles were abused and not maintained, employees made their own travel arrangements and abused their travel privileges, the computer system was archaic, and there was terrible infighting.[6]  Mr. Bailey received no training and had no time to prepare for taking over the dysfunctional unit.  One of Mr. Bailey's supervisors has testified that DRO was "understaffed and overwhelmed."  The department "needed additional personnel, we needed space, we needed positions . . . money, we needed all sorts of things."  Mr. Bailey worked hard to get the Department under control and had some successes.  Under Mr. Bailey, the computer system was modernized, a travel manager was established, and the detainee population, which increased from sixty-two to over 350, was centralized.  Throughout his tenure as ADD, Mr. Bailey always received performance ratings of excellent and outstanding.  *See Supra* n. 5.

Mr. Bailey's sudden promotion to ADD not only burdened him with the pressures of running and improving a poorly-functioning department, it also instantly elevated him from an anonymous government servant to a man of prominence in certain circles.  Mr. Bailey was not prepared for either change.  After he became ADD, many businessmen, attorneys, and others regarded Mr. Bailey as a powerful figure and treated him like a V.I.P.  Mr. Bailey considered some of those people to be his friends and accepted their offerings.  Those friends then sought immigration favors from Mr. Bailey in return.  A weakness in Mr. Bailey's character -- one he was not previously aware of but that he now fully acknowledges -- led him to oblige those friends in ways that were wrong and illegal.  Mr. Bailey should have known better, and he

---

[6] In his sentencing memorandum, counsel for Antonio Ivezaj highlights the problems at DRO and places all of the blame at Mr. Bailey's feet without acknowledging the pervasive problems that preceded Mr. Bailey's tenure.  He then compares Mr. Bailey to Mr. Ivezaj and argues that Mr. Ivezaj should receive a lighter sentence.  His comparison of these two men is absurd.  Mr. Ivezaj has prior criminal convictions for 3rd Degree Criminal Sexual Conduct (2 counts), Assault with Intent to Commit Sexual Penetration, 4th Degree Sexual Conduct and Absconding.  His Guidelines range is higher than Mr. Bailey's because of this criminal history.  Unlike Mr. Ivezaj, Mr. Bailey has no criminal history and has honorably served his country in many capacities including as a Sergeant in the United States Air Force.

regrets his actions deeply, because he is not only ashamed by his conduct and the weakness it shows, but also for the shame and humiliation he has brought to his family.

But Mr. Bailey did not act to enrich himself monetarily; in fact, the items he accepted were all things that he easily could have afforded on his own.  Although this does not excuse his conduct, Mr. Bailey's crimes occurred because he was unprepared to handle his sudden stature (a stature he did not himself seek out), and he became intoxicated by the excitement of being treated as an important person.  Mr. Bailey liked receiving attention when he walked into certain restaurants.  He felt important when successful people afforded him special treatment.  Most of what Mr. Bailey received over the years was relatively minor consideration.  The PSR lists approximately $5000 in free meals from Leon's Family Diner, $5000 in casino chips, and $500 in gifts of jewelry, alcohol and clothing that restaurateur Samir Leon gave Mr. Bailey over a five-year period.  Most of Mr. Bailey's meals at Leon's Family Diner cost around $10, often less. He could easily have purchased that food himself without any financial stress.  Mr. Bailey is not a frequent gambler and was not in need of any casino chips.  The gifts of jewelry, alcohol and clothing were mostly Christmas gifts and, Mr. Bailey also gave Christmas gifts to Mr. Leon, whom he believed to be a friend.

The same is true for the consideration that Mr. Bailey received from Namir Daman.  Mr. Bailey received $500 in landscaping services from Mr. Daman, and Mr. Daman paid $1500 for an attorney that Mr. Bailey consulted.[7]  Mr. Bailey could have afforded to pay for those things. Rather than acting to gain financially, Mr. Bailey was motivated by his own weakness for special treatment.  Rather than being greedy, Mr. Bailey was simply unprepared for his position and became weak to the attention it brought his way.

---

[7] Mr. Daman has been sentenced by this Court to thirty-six months of probation in case no. 07-20590.

Although the PSR refers to monetary payments, those payments were not made to Mr. Bailey, and Mr. Bailey never received cash payments from Samir Leon, Namir Daman, or Talal Chahine.  The PSR references restitution payments of $10,000 and over $250,000 that, with Mr. Bailey's assistance, Talal Chahine recovered from employees who had stolen money from him. *See* PSR at ¶¶30, 31.  Mr. Bailey did not receive any of that money.  Similarly, Mr. Bailey did not receive any of the approximately $308,736.76 in money and items that Patrick Wynne stole from INS/ICE detainees.  The Government conducted a thorough investigation of Mr. Bailey's assets, finances, and tax filings and has verified that, beyond the consideration listed in the Plea Agreement and the PSR, Mr. Bailey was not financially enriched as a result of his crimes.  The information before the Court thus demonstrates that Mr. Bailey was not motivated by monetary greed, but instead by a weakness for the attention that accompanied the gratuities he received.  While no motivation to commit a crime is acceptable, when evaluating "the nature and circumstances of the offense" in this case, Mr. Bailey asks the Court to consider that he was not significantly enriched by his misdeeds.

Mr. Bailey does not dispute any of the facts stated in the Plea Agreement or the PSR, but he does ask the Court to consider additional information that provides context to some of the facts listed in the PSR.  For example, the PSR states,

> Further, between 2001 and 2004, BAILEY was aware of and approved monthly payments for two private storage units rented by Wynne.  These units were used by Wynne to store and conceal property stolen from aliens.

PSR at ¶18.  Mr. Bailey agrees that he approved the payments for the storage units.  Although Mr. Bailey was aware of Mr. Wynne's property crimes and agrees that he is guilty of Misprision, Mr. Bailey did not know that Mr. Wynne used those storage units to store property stolen from aliens.  When Mr. Wynne sought Mr. Bailey's approval to pay for the storage units, Mr. Wynne

17

stated that the storage units were necessary to warehouse large and bulky items seized from aliens.  Mr. Bailey believed him.  Mr. Bailey did not knowingly approve payment for a storage site for Mr. Wynne to hide stolen property.

The PSR also states,

[]Farraj retained Daman, who immediately contacted BAILEY and ensured that Farraj was not deported.  Thereafter Daman was able to secure Farraj's release from ICE custody on October 7, 2002.  On October 17, 2003, Farraj was charged with homicide in Macomb County and is currently serving a 25 to 50 year sentence for Second Degree Murder.

PSR at ¶24.  Mr. Bailey admits that he assisted Mr. Daman by not immediately initiating Mr. Farraj's deportation and that this was a criminal act.  It is noteworthy, however, that Mr. Farraj's case caused great confusion within ICE for reasons that had nothing to do with Mr. Bailey.  In fact, as a result of errors that Mr. Bailey was not aware of, there were several different immigration files with different A-file numbers for Mr. Farraj.  As a result, neither the agents, nor Mr. Bailey knew the full extent of Mr. Farraj's immigration situation.  Mr. Bailey's intervention resulted in only a ten-day delay in Mr. Farraj's deportation proceedings.  Realistically, Mr. Farraj would not have been deported within that ten-day period in any event.  Ultimately, Mr. Daman successfully pursued relief for Mr. Farraj through the immigration court.

The PSR further states, "[Nawal Younan] retained Daman, who charged $5,000.00 and advised her he would use some of the money to 'feed' BAILEY."  *See* PSR at ¶25.  It is uncontested that Mr. Daman never paid any of the money that he received from Ms. Younan to Mr. Bailey.[8]  Mr. Daman often boasted about his friendship with Mr. Bailey and used Mr. Bailey's name when marketing himself to clients and justifying his fees.

---

[8] The PSR also says, "[a]s a result, Younan was not removed from the United States despite having a valid order of removal on file."  PSR at ¶25.  While Ms. Younan's deportation was unlawfully delayed by Mr. Bailey's actions, ultimately, she was deported.  Ms. Younan's husband and daughter were deported on December 25, 2003.  She was allowed to remain in the United States for a short time longer and was deported in early 2004.

The PSR states,

> Between October 2000 and January 2005, BAILEY allowed Haddad to enter the United States based on a false application filed with INS, change her status as a lawful resident of the United States, and then adjust her status to a lawful permanent resident of the United States.

PSR at ¶27.  This statement is accurate in the sense that Mr. Bailey did not reveal Ms. Haddad's unlawful presence in the United States or take action to prevent her frauds.  However, Mr. Bailey did not facilitate Ms. Haddad's initial entry into the United States or directly assist with her efforts to change her immigration status.  Mr. Bailey had no involvement in the marriage scam beyond that stated in ¶26 of the PSR, specifically, Mr. Bailey "advised LEON to hire an immigration attorney, Namir Daman.  BAILEY advised Leon that Daman was a person who could work the immigration system to bring Haddad into the United States and keep her here thereafter."

### c.      Deterrence, Incapacitation and Rehabilitation

The Court is required to consider the need for the sentence imposed to deter further criminal conduct and rehabilitate the offender.  *See* 18 U.S.C. § 3553(a)(2).  In this case, specific deterrence has already been achieved.  Mr. Bailey stands disgraced by his actions and the resulting criminal convictions.  He lost his career and has brought shame to himself and his family.  Becoming a criminal defendant has been a jolting experience for a man who has served as a soldier, a law enforcement officer, and a government official, and who never fathomed that he would find himself in prison for any reason.  This experience, independent from the incarceration that lies ahead, has humiliated Mr. Bailey and given him a clear understanding of, and regret for, his past conduct.  Furthermore, the termination of Mr. Bailey's government service renders him incapable of repeating his conduct.  Mr. Bailey's removal from the government, and the shame and humiliation that this criminal prosecution has brought to him,

will deter him from ever breaking the law again.  For those same reasons, incarceration to incapacitate Mr. Bailey is unwarranted, because Mr. Bailey poses no risk of recidivism and is not a danger to the public.

Rehabilitation, like incapacitation, should not factor meaningfully into Mr. Bailey's sentence.  Mr. Bailey is not addicted to drugs or alcohol and, aside from the depression and anxiety caused by this case, he does not suffer from any psychological disabilities.  *See* PSR at ¶71.  Instead of Court-imposed rehabilitation, Mr. Bailey needs to rehabilitate his own character and restore in himself the values that he personified for most of his life.  He has already traveled far down that road.  Mr. Bailey has confronted the reality of his own misconduct, he understands the weaknesses within him that led him to commit these crimes, and he accepts the fact that he must be punished.  Mr. Bailey's acceptance of these facts has progressed steadily over time.  At times after his arraignment, Mr. Bailey struggled to grasp the reality that he is a criminal defendant and had difficulty acknowledging and accepting the fact that he had committed crimes during his government service.  After taking a hard look at himself and his actions over several months, Mr. Bailey fully accepts what he has done and I prepared to receive the consequences of his conduct.  Through introspection and psychological therapy, Mr. Bailey has achieved the type of rehabilitation that is necessary to ensure that he never again engages in criminal activity.

## V.  CONCLUSION: FOURTEEN MONTHS OF INCARCERATION IS THE APPROPRIATE SENTENCE

Mr. Bailey does not ask the Court to excuse his misdeeds or to spare him from incarceration altogether.  He asks the Court only to view his conduct in the broader context of his otherwise upstanding life, his career of military and government service, and his sincere acceptance of responsibility.  The advisory range of imprisonment for Mr. Bailey under the Sentencing Guidelines is thirty-to-thirty-seven months of incarceration.  Mr. Bailey asks the

Court to conclude that this sentencing range is greater than necessary to achieve the sentencing

purposes of 18 U.S.C. § 3553(a).  In light of the factors set forth herein, counsel for Mr. Bailey

respectfully submits that fourteen months of incarceration is the appropriate sentence.

**Dated:**  **March 4, 2009**                          Respectfully submitted,


                                                        /s/ Michael Starr
                                                        Michael Starr
                                                        On Behalf of Roy Bailey
                                                        Schertler & Onorato, L.L.P.
                                                        601 Pennsylvania Ave., N.W.
                                                        North Building, Ninth Floor
                                                        Washington, D.C. 20004
                                                        Telephone:  (202) 628-4199
                                                        mstarr@schertlerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2009, I electronically filed the foregoing Sentencing

Memorandum with the Clerk of the Court using the ECF system, which will send notification of

such filing to the following:

AUSA Bruce C. Judge
211 W. Fort Street
Suite 2001
Detroit, MI 48226
Bruce.judge@usdoj.gov

/s/ Michael Starr
Michael Starr